Case number 17-1116. Nicholas J. Bonacci, a petitioner versus Transportation Security Administration. Mr. Bonacci for the petitioner, Mr. Shee for the respondent. May it please the Court. Good morning. I'm Nicholas Bonacci, petitioner pro se. I would request three minutes for rebuttal. This petition for review presents a very simple question of whether the TSA has statutory authority to conduct passenger screening of airline crew members and employees. Oftentimes, this Court is faced with very complex cases concerning scientific or financial questions. However, this case is a simple yes, no, up-down proposition for the Court today that became ripe for review on March 2, 2017 when the TSA promulgated an agency action in the newspapers. The TSA announced, amongst other things, enhanced pat-down searching of airline crew members. I would remind this Court that enhanced pat-down searching was originally proposed in 2010 as an alternate means of screening for persons who opted out of advanced image technology passenger screening. Am I right, Mr. Bonacci, that you're not objecting to anything that happens when you go through the crew checkpoint, even if there's additional screening there? Your objection is focused on being sent to the passenger checkpoint? That's your case, right? Let me clarify that. The alternate screening is a contention. The wording alternate screening is used by the TSA in lieu of passenger screening. And I've made it clear in most, actually all my briefs, reply briefs, that I'm not opposed to additional screening. The TSA is well within their rights. What I am opposed to, as stated in the law, is passenger screening for crew members and, in fact, airline employees. To answer your question more specifically, when I use that alternate means of entry, known as the KCM, the known crew member entry point, at the George Bush Houston Intercontinental Airport, they have a device in which they randomly select persons, crew members and crew members only, to send them to passenger screening. In the known crew member entry point, if you go through that, could a crew member be subject to additional screening or pat-downs in that line without being sent to the passenger? Well, those are two separate things. Additional screening was, in fact, one time before, in Houston, was, in fact, done, where they may, after you went through the KCM access portal, they may say, may I have a look in your bag? You're not objecting to any of that? No, no, sir. Only what happens after the arrow lights up, right? That is correct. Then you have to go over to the other line. That is correct. I'm glad to have that clarification. I also want to get you to clarify whether this has happened to you. Yes, it has. When was that? It actually happened this year. Well, okay. Now, you said that this protocol was promulgated in April of 2017? The order, correction, the agency action was promulgated on March 2nd, 2017. And you filed in April? I filed on April 11th, 2017. And at that point, you knew about the order, but it had not yet been applied to you, is that right? Has it since been applied to you? Oh, yes, it has been applied many times after that. In fact, one time it happened was on Christmas Day, 2017. Where you were selected, but randomly? That is correct. Yes, I would estimate it's happened no less than a dozen times, approximately. In a period of less than two years? That is correct. Year and a half? And when that's in those dozen times, were you ever subjected, when you went to the passenger line, to a pat-down? I have not since filing this at the Houston Intercontinental Airport been, when directed to the passenger screening, subjected to enhanced pat-down searching. You have not? I have not. What did you mean in your brief when you said, on your petition on page 8, you say, petitioner is not harmed per se by enhanced, but harmed per se by enhanced searching. Yes, I thank you for the opportunity because the government has really used that. So, anyway, I could not come in to this court and say that screening itself is harmful. Here I am standing in this court today. I had to go through similar type of screening. That would be an absurd argument to say that screening of any kind, administrative screening. No, but it says here, enhanced searches. That's your, am I quoting you correctly? No, the passenger screening is not itself, not itself, per se, harmful. So what is it that's harmful? Well, what is harmful then, as argued in the brief, is the requirement to comply with an unlawful act of the TSA and the unknown consequences. What's the unlawful act? Didn't they give notice in 2011 that there could be random screening as a part of the known crew member program? That was, that's in the brief, and that was rescinded. That was in 2010. I started down this path in 2010 when they first proposed this, and then with, as noted in the brief, when the Airline Pilots Association, then president, made last-minute negotiations, the government backed away from that position. And so, as noted in the brief, it would have essentially rendered any effort to petition this court moot. There was no SOP adopted in 2011 to this effect? No. Here again, I am not allowed to see the orders and directives, but from what you can see in the record as publicly disseminated public statements by Homeland Security officials, no, they withdrew the effort to include crew members, pilots, in advanced, both, advanced image technology screening and path-down searching. Your initial objection is to being diverted to the passenger screening line. Say that again. I didn't hear you. I'm sorry. I think the initial, your objection, at least your first objection, is to being diverted to the passenger screening line. Is that correct? That is, I wouldn't say that's my first one. Is that among your objections? It's amongst my objections. What is the harm you associate with that? Well, that gets back to the primary objection, which is the Congress never intended for crew members to go through passenger screening. Now, the question I'm asking is the harm to you, the injury that you need in order for standing. Correct. So, since it's unlawful, that's my contention, it's unlawful. Orders, directives, rules are being made that are unlawful, and I'm asked to comply with them when they're published in newspapers and magazines. And, even worse yet, I don't know what the consequences are for my noncompliance. But the question is, how is your compliance a harm to you? What is the nature of that harm? Is it an inconvenience? What is it? Well, that's, the harm comes from not, that's why I say per se, the harm is not the searching. Well, let me see if I can help get it this way. Suppose, just to follow up on the question, suppose the little arrow that says go to the passenger, right? Correct. Suppose that arrow simply meant when it goes off, you get a pat-down. You don't have to go to the other, you just get it there. Would you be objecting to that? That's a good question. It's a hypothetical question. It's not, it's not. But both judge Ginsburg and I are trying to understand what, exactly what you're, what you're complaining about. Passenger screening. Okay, so the answer to my question is you wouldn't object to having pat-downs in the known crew line to be sent to the passenger line, right? I, I, not specifically, I object, my contention is against passenger screening of crew members. That's what I just said. Whether or what, whether it does or does not include enhanced pat-down searching. But to answer your question, Your Honor, if the government was to say, okay, at the end of the KCM line, we're going to do additional screening, which I have no objection to, and that may, we might look in your, your flight bag, and maybe we're going to pat you down a little. I don't think I would really like that, but that's not in contention today, but I don't, I, I'm at a loss to say why they could not do that. But that's not in contention. Okay, is your objection, so I, you know, I just got back from a flight. The passenger lines were really long, and I can understand why you might not want to go there. Is that the problem? Do you have to wait? No, that, I, I would not characterize that as the harm. So what is the problem? Is it that you're not treated like a pilot? No, as I was saying, the problem here is. Is it demeaning? No. That's, that's, that's in the brief. Other people have stated that. My contention is that the passenger screening itself is unlawful, and it is disseminated in a manner which I'm not able to see it. So fine, I, I get the TSA has, to a certain extent, they, they cannot publish their orders. I get that. But I am being asked to comply with an unlawful procedure with lawful sanctions that could be meted out. But I don't know what they are. All right. So. You're saying all passenger screening is unlawful, in your view. For, actually, the Congress said for airline employees. And when I'm here. Well, that's what you should say. No, I'm confused. Why for airline? Well, I would direct this. I thought your answer was that all passenger screening was unlawful. Now you're saying passenger screening for airline employees. All right. Now, why is that so? I would direct this court's attention to, it's in the brief. It's U.S. Code 4944901. It's the actual law taken from the act. It's in the brief. I can cite the congressional record. But the Congress was very clear about this. When the Congress originally started down this path shortly after 9-1-1, they actually wanted everyone coming into an airport to go through a metal detector. Cool heads prevailed. And as reflected in the record, you can see that the Congress began to realize that they would have to have reasonable measures in place for people coming into an airport, namely airline employees. So the Congress contemplated background checks in lieu of searching. The facts are the vast majority of airline employees do not get any kind of screening, much less passenger screening. So what I'm saying is simply that the Congress not only put that into the law, but as shown in my briefs, the record will clearly show the congressional record that the Congress actually did not want airline employees to go through passenger screening. Okay. Okay, thank you. You're welcome. We'll hear from the government. May it please the Court, Mike Shee for the government. I just want to emphasize that it seems as if the upshot of Mr. Bonacci's position, as best I understand it, is that it would be unlawful to randomly screen pilots and crew members before allowing them access to the sterile area. That simply is not supported by any of the statutes that Mr. Bonacci cites, and I would refer the Court to the various authorities that we've... I thought you said that what he objected to was being randomly selected to go to passenger security. So it's... Suppose, for example, that's his argument. Okay. That's what he's objecting to. Then what do you think? So if that's Mr. Bonacci's argument... Yeah. What do you think about that? ...then there would be a couple of questions. The first question would be whether Mr. Bonacci has standing to challenge those procedures. Okay. Well, what do you think about that? I mean, he says he's been a dozen times randomly selected to go through passenger screening. So I think that with respect to... So let me try to disaggregate two things. So the first issue is whether, as a general matter, TSA may divert randomly some participants in the known crew member program to a passenger screening checkpoint. And the second question is what the content is of the screening. Okay. And so with respect to the first question... Yeah, go ahead. ...TSA publicly announced in 2012 that all participants in the known crew member program should still be aware that they may be subject to additional screenings. No, I guess that's the merits. I thought you were going to talk about that. And right. So with respect to that, I just wanted to emphasize that. That was made clear to folks no later than 2012, and the petition was filed in 2017. I like the way you disaggregate it. So question number one is random selection to go to passenger screening and then random selection within that line to get pat-downs. Yes. Okay. So standing? So standing as to random selection to go to the additional screening checkpoint. Mr. Bonacci has not identified any constitutionally cognizable harm that accrues when he is subjected to additional screening at that line. The three theories of injury that he has presented in his brief are as follows. Suppose he has made my complaint that you have to wait 20 minutes. Would that have been sufficient? That might be sufficient, Your Honor. Okay. He's being ordered to go somewhere. I'm considering a lawsuit. That's all. Why isn't being ordered to go somewhere an imposition sufficient to confer standing? So, you know, some people might think of it as an imposition. Other people might not think of it as an imposition, and it depends on what petitioner's theory of the imposition is. And petitioner has been quite clear that the three injuries are as follows. One, he is harmed because the screening at the passenger checkpoint is issued in violation of the APA's notice and comment provisions. Two, he's harmed because the diversion is unlawful under the TSA's statutes. And three, he's harmed because he doesn't know what exactly to do at the checkpoints. And for the reasons articulated in our brief, none of those theories of injury is sufficient to support Article III standing. And the second one was? The second theory is he's harmed because TSA lacked statutory authority to issue the order. So let's just read that a little bit indulgently. I'm harmed because I'm required to do something which I don't want to do and for which there's no authority. But the harm part in terms of Article III is the first clause. That's right. So the critical difference, Your Honor, between your characterization of that argument and the argument as I understand it to have been presented in the briefs is you said, I don't want to do it, and yet I'm being forced to do it, and I also think it's unlawful. The first part of that, I don't want to do it, is not apparent from Mr. Bonacci's pleadings or from Mr. Bonacci's brief. And to the extent that that really is what Mr. Bonacci means, he would have a much easier path to establishing standing, but he would still – What do you think of the – I mean, this Court, we always say, we interpret pro se pleadings more liberally. I understand that, Your Honor. Would that principle apply here? The Court is certainly free to interpret the brief in that liberal manner, and we would point the Court to Mr. Bonacci's statement that he is not harmed per se by any sort of enhanced screening as perhaps a reason not to supply that reading. All right. So we can make an indulgent reading, and we have an institutional preference for resolution on the merits. Right. So I would say, furthermore, that even if you think Mr. Bonacci has standing to challenge the diversion to the passenger screening area, that challenge would be untimely because TSA publicized it no later than 2012, as indicated in our brief. Yeah, but what is the official nature of the publication you're talking about? You say some newspaper article. It's not a newspaper article, Your Honor. Well, where is the official rule or order or whatever? Normally when agencies look to say that something is untimely, they point to an official record saying, often we gave notice and comment, or we did it, or we issued an order and it's in the Federal Register, or whatever. Reading the briefs is impossible to try and figure out what you think and what he thinks the agency's actions are that are at issue. So where is the official reference to a 2012 agency action? The official reference. The official reference, Your Honor, would be in the modification TSA made to its standard operating procedures to permit the known crew member program to exist. That is not public because these documents have been determined by TSA to constitute sensitive security information. And so in this context where TSA will issue an order but the order cannot be made public for security reasons, this Court has held that notice of this modification that TSA announces to the public is when the 60-day timing in 46.110 begins to run. That's the Avia Dynamics case. And so as we indicated in our brief and as we reproduce at page 13 of our supplemental appendix, and this is in the public record, TSA issued a press release on its website announcing that it was expanding the known crew member program and announcing that that program would always incorporate random and unpredictable security measures. And the date on that? I'm sorry? The date on that? The date was 2012. And the petition for review was brought in 2017. The other thing that we're going to do is to say that's sufficient notice? Yes, Your Honor. It's the Avia case that I just cited to Judge Edwards. I want to turn then to the other component of what I understand Mr. Bonacci's challenge to be, which is to the universal pat-down procedure. And as to that, I would just emphasize that Mr. Bonacci has not alleged that he has ever been patted down and indeed has stated that even after the filing of the petition and the briefs, he still has not been patted down. But isn't it enough that he alleges there's a policy? I'm sorry? He alleges there's an existing policy to do random pat-downs. And he goes through the lines. Why isn't that enough? So two things need to happen for him to establish that the pat-down will imminently apply to him for purposes of Article III. First, he needs to fall within the very small percentage of known crew member participants randomly selected for additional screening. And even then, once you get— He's in that category, right? He is, Your Honor. But once you get to an additional screening checkpoint that passengers can use, the pat-down is never the first line of screening. No, but it's random. People are randomly selected. One way to get pat-down is a random selection, right? That's right. And that's part of the TSA policy. Yes. So he's challenging a policy that he could be— in other words, it's not like the Chokehold case where there was no— you know, the Supreme Court's— LAPD. LAPD. It's not like that where there wasn't a policy to use Chokehold. Here, he's alleging there's a policy of random selection for enhanced pat-downs. Right. And he goes through the line. I just don't see why that's not enough. Right. So I take the argument to be that it's just layering a probability that's very small on another probability that's very small. Wait a minute. The first one's not small at all. It's happened a dozen times. Yeah. So I don't want to get into the precise percentages as to that. The percentages could be very high or very low, but it's happened a dozen times. With respect to the initial one of being diverted to additional screening. Yeah. So the second one isn't a probability being layered on a probability. It's a probability layered on a certainty. So it is true, Your Honor, that Mr. Bonacci has alleged that in the past he was selected for additional screening. And if the court were then to think that because TSA has the policy of subjecting even a very small percentage of people who go through the additional screening line to a pat-down, that's sufficient to support standing. I would emphasize that the universal pat-down challenges only as to whether or not it needed to be promulgated through notice and comment rulemaking. And for the arguments that we've made in our briefs, we think that the universal pat-down is better understood as a procedural and non-substantive rule. He's challenging the universal pat-down. Yes, Your Honor. And I take his argument to be that the universal pat-down does not conform to the notice and comment requirements. No, that's your read of his brief. That's not what he says. Quite the contrary. He doesn't. I read his brief to say that's not what has been raised. He's challenging the rule or order or whatever you call it that allows I would have happily joined the suit challenging the universal pat-down, but in any event, that's not the matter. He's clearly saying it's an offensive, I thought, clearly saying it's an offensive and aggressive approach, which is impermissible. No? He isn't raising a notice and comment challenge. He said that. He said that in his brief. Yeah, he clearly said he's not. Right. So it's hard for me to try to disaggregate the various types of claims that Mr. Bonacci might try to break. Well, I just disaggregated it for you. He's saying it's an offensive pat-down. That's the challenge. Right. So to the extent that Mr. Bonacci's concern is with the nature of the pat-down, I would note that this Court and other courts, most recently in Epic, have held that similar sorts of screening by TSA, such as the AIT screening, do not independently violate, for example, constitutional principles. And moreover, this Court — But that's the merits. Yes, Your Honor. At this point, I would think that we're speaking about the merits. Oh, okay. So you just got convinced by Judge Edward's question? Yes. Oh, no. I'm sorry, Your Honor. I had understood Judge Edward's question to be, you know, on the merits, what is Mr. Bonacci's challenge. I misunderstood you. I'm sorry. Yeah, on the merits. And so my response to that question is, to the extent that the Court construes it not as an APA challenge, but as another sort of challenge to the lawfulness of what TSA is doing, because the pat-down is perhaps too intrusive. Why can it not be an APA challenge? So I guess what I'm saying is, under this theory, it would be the APA's universal pat-down procedure is contrary to law. So one possibility is that it could be too invasive under the Constitution. And my response there is that other courts have rejected that claim. With respect to this particular pat-down? Not respect to the universal pat-down, but with respect to other pat-downs. Isn't that really the issue, that the TSA is up the ante now, and this pat-down that's being used now is really pretty amazing? The issue is the extent to which TSA's actions at the checkpoint violate some expectation of privacy. I take that to be the premise of the question. And the courts have said that what happens at the checkpoint, the Eleventh Circuit in the Corbett case, for example, has held that what happens at the checkpoint is an administrative search, where the government has plenty of latitude to figure out the appropriate procedure to protect national security. They have upped the stakes. And there's certainly evidence of that. I'm not supposed to be looking to my own experiences, but they've changed it. They've upped the stakes. And I thought he was saying it's really quite aggressive now, and it's not what the courts were looking at before, which was, you know, it may have bothered some people, but it was not where it is now, which is very aggressive. I don't want to get into the specific differences between the two. But hypothetically, if that's what he's arguing, that is that what's going on now is really quite unbelievable and unacceptable, and people should not be allowed to touch me in the way in which TSA is now endorsed. And it's different from what was permitted by the courts before. So if that were what Mr. Bonacci said, and I disagree with that characterization of Mr. Bonacci's arguments, but if that were what he said, I think he would have an easier time of establishing his standing to challenge the universal pat-down. I still think that on the merits the universal pat-down is defensible, and Mr. Bonacci hasn't articulated why TSA's expert judgment in this regard should be disregarded. All right. Okay. Thank you very much. Thank you very much. Did Mr. Bonacci have anything? No. Mr. Bonacci, you can take one minute. Thank you. Thank you, Your Honor. The government points out that I have not been patted down, as you asked, at the Houston airport. That is a true statement. I have here papers from other people, but, I mean, it's inadmissible. Who have? Crew members. Who have been patted down? One of them publicly humiliated, but that's really inadmissible and not at issue. What was the nature of his objection or her objection? In both cases, they were not allowed to go to work, and they actually filed in the U.S. State District Court, District of Columbia. One, a friend I've known for 30 years, she was actually publicly humiliated. This goes back when the pat-down searching was first introduced. But they were, I do agree that I have not, as since the March 2, 2017 order, I have not to date been subject to enhanced pat-down searching. Are you challenging the enhanced pat-down as being at a new level and offensive where it is now? I am. Or not? Yes or no, so I understand. Yes, in totality, all of it, along with passenger screening. No, no, no. I'm trying to get the pieces of your case clear in my head. I understand the first piece, and now I'm trying to understand what you're claiming about the universal pat-down. I thought you might be saying that it's now different and offensive. Invasion of privacy, it's not acceptable in any term. Or not? I will be very clear on that. The questioning went to that line. I am not lodging a Fourth Amendment invasive or unreasonable search claim. That's in my brief in several places. This would be a waste of this Court's time. It's been tried before. A lot of these other cases, they've done it on Fourth Amendment grounds. This is simply what's, that's why I'm in this Court. It's because it's an administrative law issue, not a constitutional claim at all. I have never made that argument. Regarding the harm, I would ask this Court to consider not so much, well, I would ask this Court to consider the harm from the consequences of noncompliance. And I would cite, as I did in my brief, Abbott Laboratories, which in Abbott Laboratories it cited CBS versus Sanders. And these cases looked very specifically like, for example, in CBS, the government made a rule. And the affiliate stations didn't know whether they were coming or going. If they didn't comply, they were told they would be subjected to consequences. In Abbott Laboratories, they told the drug makers, if you don't comply, first they told them criminal sanctions. And they said, no, no, no, we don't really mean that. It could be civil sanctions. So I'm subjected to sanctions, which I don't know what they are, for an unlawful act that I'm being asked to comply with, which is passenger screening. Wouldn't they just, if you said, if a little arrow went off and they said, okay, Captain, go over there, and you didn't, you just wouldn't be let through, right? No, sir. That is in my brief. It is in the, it's an appendix. That's in a magazine article. And you may recall, I quote a case in Hawaii, it's called the Coley, where a gentleman was in a, going through TSA screening, set off an alarm. And they couldn't resolve it. And they found a crack pipe. And a police officer came over. And then he was taken into custody and arrested. And he tried to claim. Wait a minute, was he a crew member? Sorry? A crew member? No, sir. This was a passenger. Absolutely. The TSA has put. He was arrested for having a crack pipe. Well, the TSA has laid this, has purported in a magazine article in my brief, as this for a reason that I cannot opt out of surging screening. In other words, when I show up for screening, I have to go through the screening. Yeah, okay. Anything else? No. Okay. Thank you very much. Case submitted. I thank this court very much. From the bottom of my heart, I really do. Case submitted. Thank you. Stay in place.
judges: Tatel, Edwards, Ginsburg